823 So.2d 971 (2002)
Juan L. CURET
v.
Sharon R. CURET.
No. 02-CA-212.
Court of Appeal of Louisiana, Fifth Circuit.
June 26, 2002.
Raymond C. Burkart, Jr., New Orleans, LA, for Sharon R. Curet, Defendant-Appellant.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS and SUSAN M. CHEHARDY.
SUSAN M. CHEHARDY, Judge.
This is a child support proceeding in which the mother, domiciliary custodial parent, appeals a judgment granting the father's motion to reduce child support.[1] We affirm and amend.
*972 Juan Curet and Sharon Ricks (formerly Sharon Ricks Curet) are parents of a girl born on November 16, 1994. Curet filed a petition for divorce on August 27, 1999, in which he sought joint legal and physical custody of the child. On April 17, 2000, Ricks filed a reconventional demand in which she requested child support.
On May 25, 2000, the parties entered into a consent judgment that granted joint custody, with Ricks designated as domiciliary parent. It established a visitation schedule and ordered Curet to pay Ricks $205.00 per month in child support, plus 50% of medical insurance, 50% of extraordinary medical and dental expenses, 50% of before- and after-care, and 50% of summer camp.[2]
Curet was granted a judgment of divorce on June 28, 2001. On the same date, the parties entered into a consent judgment, under which the terms of the prior consent judgment on custody remained in force.
On August 15, 2001, the domestic commissioner of the 24th Judicial District Court rendered an interim order regarding child support, pending an evidentiary hearing before the district court. The commissioner stated that he was implementing the recommendation of the hearing officer. The commissioner required Ricks to maintain health insurance and pay private school tuition. He assessed Curet child support in the amount of $605.00 per month, retroactive to April 17, 2000 (the date Ricks filed her reconventional demand requesting child support), plus 56% of extraordinary medical and work-related daycare and summer camp expenses. The commissioner gave Curet credit for any payments made and ordered him to pay $100.00 per month on all arrearages due for child support and related expenses.[3]
The commissioner noted that this was an interim order without prejudice and, in the event the district judge determined that the amount was inappropriate, that any amount fixed after an evidentiary hearing would be retroactive to April 17, 2000.
On August 15, 2001, the date the commissioner made his ruling in open court, Curet filed a motion to transfer the proceedings to the district judge and entered a written objection to the commissioner's order.
On August 29, 2001, Curet filed a motion to reduce child support, alleging that he had been laid off his job on July 27, 2001.
The matter came before the district judge on October 12, 2001.[4] Curet contended that in calculating his monthly gross income, the commissioner incorrectly relied upon his income before he became unemployed. Ricks argued that Curet was at fault in losing his position and that the child support should not be reduced.
The evidence at the hearing showed that Curet, who retired from the New Orleans *973 Police Department ("NOPD") in 1996, receives a monthly distribution from his police pension. Curet's annual gross pension distribution for each of the years 1999, 2000, and 2001 was $14,092.80; therefore, his monthly distribution was one-twelfth of that amount ($1,174.40).
Curet worked for Harrah's Casino from October 1999 until July 27, 2001, when he was terminated. Two weeks prior to his termination, 148 people had been laid off. Curet's Motion to Reduce stated that he lost his job at Harrah's as part of the 148-person layoff. At trial, however, he stated that he was not laid off, but was fired.
He stated he filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on August 15, 2001, alleging age and race discrimination against him by Harrah's. (He is 51 years old and white.) He identified copies of his performance appraisals from Harrah's and stated that his appraisal scores fell into the top range. At the time he was terminated he was earning $31,900.00 per year at Harrah's.
Curet also filed for unemployment compensation benefits. Harrah's opposed his application on the ground that he was dismissed for cause, for violating company policies. However, no Harrah's representative appeared at either the initial determination hearing or at the appeal hearing. The hearing officer found that there was no violation of company policy and that Curet was not disqualified from receiving benefits. The administrative law judge dismissed Harrah's appeal when no Harrah's representative appeared.
Curet began receiving a benefit of $258.00 per week. At the time of the hearing he was still receiving unemployment compensation. He testified that he had been looking for other employment, but said, "[N]obody's really hiring any more." He had one offer that was retracted after the September 11, 2001 terrorist action. He said that other hotels and casinos have cut back on hiring since September 11.
Curet testified that his EEOC complaint specifically named Harrah's director of employee relations as having discriminated against him by spreading a rumor that he had been fired from the New Orleans Police Department for racism. He asserted he had not been fired from NOPD, but had retired.
He said he also complained to his immediate supervisor, the transportation manager, that the director of employee relations failed to support and overturned his disciplinary actions against employees he supervised. He said she told him she believed the black employees more than him, because of allegations that had been spread about his being a racist.
On cross-examination, Curet denied that he had retired while under investigation for abuse of alcohol. He admitted that he was told he had tested positive for alcohol in his system while involved in an accident while on duty as a police officer. However, the investigation of that incident was never completed because he retired.
Curet testified that he worked as a security guard at Loyola University in 1999 and earned $6,816.00. He admitted he was terminated from that job for failing to comply with attendance regulations, because he was taking too much time off. He denied having either a drinking or a gambling problem. He stated he had come to work late and had missed several days due partly to illness and partly to child-care conflicts.
Curet admitted he received a series of pay increases at Harrah's during 2000 and 2001 and that he was promoted from customer safety officer to a supervisor. At the time of his final raise, in April 2001, he *974 was earning $31,900.00 on an annual basis and also was receiving his police pension of approximately $14,000.00 per year.
Curet acknowledged that he has not made the bi-weekly arrearages payments order by the Interim Order in April 2000. He listed some of the places at which he had applied for work. He acknowledged having an associate degree in law enforcement technology and some computer skills.
Counsel for Ricks attempted to impeach Curet by asking about his verification of the statement in his Motion to Reduce that he had been laid off. Curet could not explain the presence of that statement or why he verified it. He admitted that he was not laid off, but was fired.
He testified that, according to his tax return, his total income for the year 2000 was $36,974.00.
Frances Williamson, Employee Relations/Human Resources Manager of Jazz Casino (the legal name of Harrah's), testified she serves as a liaison between the employee and the supervisors and managers. She is responsible for conflict resolution, performance enhancement, and investigating complaints. In addition, she handles compensation benefits and is keeper of the records.
She identified Curet's application for employment and noted it did not state that he had been employed by Loyola. Harrah's policy in the employee manual states that falsifying or altering company records, including employment applications, is grounds for separation. She said if Harrah's had known he omitted listing a prior employer, Harrah's would have separated him for falsifying his application.
Williamson related incidents of "coaching" or disciplinary action administered to Curet. On November 21, 2000 he received a coaching from his manager regarding an operational breakdown at the porte-cochere or front drive-in of the casino, where he was one of the supervisors. Harrah's policy was that it was at the manager's discretion whether to administer coaching over an incident. Williamson testified that was the only negative coaching listed in his file. Two others were positive coachings.
Williamson said Curet was terminated on July 27, 2001 for "violation of conduct standards" by "coercing, intimidating and threatening fellow employees," "exercising misjudgment in performance of his job," and "failing to act in a manner that would appear to give impropriety [sic] or would impair good judgment [sic]."
Williamson related that Curet was hired on November 5, 1999, at a rate of $8.50 per hour, and that over the course of his time with Harrah's he received regular pay increases. He was promoted from an hourly-wage employee to an annual-salaried employee in June 2000. His last raise was on April 1, 2001, when he received an increase to $31,930.00. She said his first three increases (February, March, and May of 2000) were all market or position adjustments; the increase in June 2000 was a promotional increase and the April 1, 2001 increase was a merit raise.
Sharon Ricks (formerly Sharon R. Curet) testified that she and Curet were present in open court on August 15, 2001 when the commissioner issued the interim order. She said that right after the ruling Curet told her that he was not going to pay it and, when her attorney asked to go back into court to get instructions from the judge, Curet left.
Ricks' records of Curet's child support payments since April 17, 2000, showed he had paid her $5,265.31 and was $5,096.93 in arrears. He also paid the school tuition, which was $2,802.09 in 2000.
Ricks said that day care for 2000 cost approximately $840.00 and summer camp *975 for 2000 was $373.00. To date for 2001, she had paid tuition of $1,181.91 on the $2,750.00 total due, plus interest at 9.75 percent. For 2001 she had paid $144.00 for before- and after-school care and $494.00 for summer camp. She verified that the requirements for care and camp were work-related.
Ricks stated that since August 15, 2001 Curet had made two payments to her, in amounts totaling $791.50. She agreed with the commissioner's estimation of her income, but said that the commissioner had understated Curet's income.
In a judgment signed on October 15, 2001, the district court vacated the interim order setting child support at $605.00 per month. The judge found that Curet was not at fault in losing his position at Harrah's. As the basis for the new obligation, the court found Curet had a monthly gross income of $1,688.70 and Sharon a monthly gross income of $2,535.00. The court set a new basic child support obligation at $612.00 per month, plus $87.00 a month for health insurance and $225.00 per month for school tuition, for a total child support obligation of $924.00.[5] The court ordered that Curet pay Sharon 40% of the total child support obligation, or $369.60 per month. The court also entered an income assignment order against Curet's Municipal Police Employees pension.
Ricks has appealed. First, she contends the trial court erred when it failed to use Curet's actual income for the calendar year 2000 when setting his child support obligation for the calendar year 2000. Second, she contends the trial court erred when it failed to use Curet's income up to July 27, 2001 (prior to his firing from Harrah's) when it set his support obligation from January 1, 2001 forward.
An award of child support is based on the needs of the child and the ability of the parents to provide support. La.C.C. Art. 141. An award of child support may be modified if the circumstances of the child or of either parent change. La.C.C. Art. 142.[6]
Child support is a continuous obligation of both parents; children are entitled to share in the current income of both parents and should not be the economic victims of divorce. La.R.S. 9:315(A).
"If a party is voluntarily unemployed or underemployed, his gross income shall be determined as set forth in R.S. 9:315.11." La.R.S. 9:315.2(B).[7] If a party is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of his or her income earning potential. La.R.S. 9:315.11.
La.R.S. 9:315(C)(6) defines "income" as follows, in pertinent part:
(6) "Income" means:
(a) Actual gross income of a party, if the party is employed to full capacity; or

*976 (b) Potential income of a party, if the party is voluntarily unemployed or underemployed. A party shall not be deemed voluntarily unemployed or underemployed if he or she is absolutely unemployable or incapable of being employed, or if the unemployment or underemployment results through no fault or neglect of the party.
"Gross income" means income from any source and includes unemployment insurance benefits. La.R.S. 9:315(C)(4)(a).
The trial court determined that Curet was not at fault in losing his position at Harrah's. Hence, by implication the court found that Curet was not voluntarily unemployed. A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993).
We find no manifest error in the trial court's determination that Curet was not voluntarily unemployed. Although Ricks' counsel tried on cross-examination of Curet to elicit evidence that Curet had alcohol and gambling problems, Curet denied it and Ricks presented no positive evidence to contradict Curet's denials.
Further, the evidence of Curet's employment at Harrah's indicated he received good employee evaluations and there was no direct testimony to establish the validity of the charges made in the termination report. Williamson's negative testimony was based only on records she was reading, not on direct knowledge of any incidents that may have led to Curet's termination. Considering the evidence, we are unable to say the trial court was clearly wrong in his determination.
With respect to the amount of the child support figures, Ricks argues, first, that the trial court should have calculated child support from April 17, 2000 to December 31, 2000 based on Curet's actual income of $36,974.00 for the year 2000, rather than using the reduced amount Curet was receiving after his termination from Harrah's in July 2001. Second, she contends the trial court should have used Curet's income from January 1, 2001 up to August 2001, prior to his termination by Harrah's, in setting his obligation from January 1, 2001 forward.
This is a somewhat different situation from an issue of simple retroactivity. The issue is not whether the child support should be retroactive to the date the payee first sought it, but whether it should be based on the payor's income when the rule for child support was first filed and during the lengthy delays before the matter came to trial, rather than solely the payor's income at the time the rule is tried.
In Saussy v. Saussy, 93-1303, p. 5 (La.App. 3 Cir. 6/15/94), 638 So.2d 711, 714, the court found that a father's child support payments should be higher for the period in which he was earning more prior to a job change due to his termination from his previous job. Further,
[R]etroactivity is not in the nature of a penalty, but merely a judicial recognition of pre-existing entitlement. The theoretical obligation exists when the need for support arises and the ability to pay exists. It is only a matter of practicality that postpones the effective date of the obligation to the time the petition for support is filed, "In the interests of judicial efficiency and social utility."... Therefore, the fact that the party resisting the payment of support did so based on a sincere belief that no obligation to pay existed, is not, because of that sincerity, excused from the obligation to pay. Sincerity and good faith are not in themselves "good cause." *977 State in Int. of Lymuel v. Duvigneaud, 97-988, p. 6 (La.App. 4 Cir. 12/10/97), 704 So.2d 398, 402.
Considering the above, we find the trial court erred in basing Curet's entire child support obligation retroactive to April 17, 2000 on the income he had at the time of the October 12, 2001 hearing. The court should have set a figure for the period from the date Ricks' rule was filed to the end of the year 2000, another figure for the period from the beginning of 2001 up to the date Curet filed his motion to reduce child support, and a third figure from the date Curet filed his motion to reduce child support up to the date of trial, each figure derived from calculations based on Curet's "actual gross income" during each period, per La.R.S. 9:315(C)(6)(a).
According to the figures in evidence, for the year 2000 Curet's total monthly income was approximately $3,081.16 and Ricks' total monthly income was $2,535.00, making their combined adjusted gross income $5,616.16. According to the Child Support Guidelines, La.R.S. 9:315.19, the basic support obligation based on that income is $757.00 per month. Adding in the cost of health insurance premiums ($87.00 per month) and school tuition ($225.00) makes the total monthly child support obligation $1,069.00 from April 17, 2000 through December 31, 2000. Curet's proportionate share is 54% of that, or $577.26 per month from April 17, 2000 through December 31, 2000.
With respect to 2001, Curet's monthly income from January 1, 2001 to July was approximately $2,658.33 from Harrah's, plus $1,174.40 from his police pension, for a total of $3,832.73. Added to Ricks' monthly income, their combined adjusted gross income was $6,367.73 per month, making the basic child support obligation $828.00. Adding in the health insurance and tuition amounts makes the total monthly child support obligation from January 1, 2001 to August 29, 2001 (the date Curet filed his rule to reduce) $1,140.00. Curet's proportionate share during the period is 60%, or $684.00 per month.
Child support for the period from August 29, 2001 (the date Curet filed his motion to reduce child support) forward should be based on Curet's monthly income from his pension ($1,174.40) and unemployment compensation benefits ($1,118.00), totaling $2,292.40. That figure combined with Ricks' monthly income of $2,535.00 results in a monthly combined adjusted gross income of $4,827.40. The basic support obligation for that figure is $673.00. Added to the $87.00 per month health insurance and $225.00 per month school tuition results in a total child support obligation of $985.00 per month. Curet's proportionate share of that figure is 47%, or $462.95 per month from August 29, 2001 forward.
For the foregoing reasons, we affirm the judgment of the trial court insofar as it assesses child support against both parties and we amend it with respect to the figures calculated by the trial court. Judgment hereby is rendered in favor of Sharon Ricks setting the monthly amount of child support due to her from Juan Curet as follows: from April 17, 2000 to December 31, 2000, $577.26 per month; from January 1, 2001 to August 28, 2001, $684.00 per month; and from August 29, 2001 forward, $455.00 per month. Juan L. Curet is to be given credit for payments already made and he is cast for costs of this appeal.
AFFIRMED AND AMENDED.
NOTES
[1] Only the appellant made an appearance in this Court. This Court's notices of lodging of the record and briefing dates and of the date set for oral argument were mailed to appellee at his last known address by certified mail, return receipt requested, but were returned stamped "UNCLAIMED."
[2] The consent judgment was read into the record, but was not rendered in writing until June 20, 2001.
[3] The interim order was not reduced to a signed judgment until October 4, 2001.
[4] On October 2, 2001 Ricks filed a Rule for Contempt, alleging that Curet had failed and refused to comply with the August 15, 2001 Interim Order. However, the Rule for Contempt was not served on Curet in time for it to be heard in conjunction with Curet's rules on October 12, 2001. It is not before us on this appeal.
[5] The judgment erroneously listed the total of the child support obligation as $1080.00; however, the correct calculation is $924.00, the amount on which the court calculated Curet's 40% share.
[6] La.C.C. art. 142 was amended by Acts 2001, No. 1082, § 2, to add "materially" before "change." However, that amendment applies only to actions filed after August 15, 2001, the effective date of the Act. This action was filed April 17, 2000.
[7] La. R.S. 9:315 to 9:315.20 were amended and re-enacted by Acts 2001, No. 1082, § 1. Among the changes were renumbering and internal redesignation of some of the statutes. Although Acts 1082 of 2001 applies only to child support actions filed after August 15, 2001, the language pertinent to the present case was not affected by the changes. Accordingly, we cite the articles under their new numerical designations.